USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __3/9/2022__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

PAUL PACHECO,                                          :
                                                       :
                      Plaintiff,                       :         **OPINION &**
                                                       :         **ORDER**
         -v-                                           :         20-CV-5975 (JLC)
                                                       :
ACTING COMMISSIONER OF SOCIAL                          :
SECURITY,[1]                                           :
                                                       :
                      Defendant.                       :
                                                       :
-----------------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Paul Pacheco seeks judicial review of a final determination by the

Acting Commissioner of the Social Security Administration, denying his application

for supplemental security income under the Social Security Act.  The parties have

cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.  For the reasons set forth below, Pacheco's motion is

granted, the Commissioner's cross-motion is denied, and the case is remanded for

further proceedings.

---

[1] Kilolo Kijakazi is now the Acting Commissioner of the Social Security
Administration.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the
Acting Commissioner is substituted for the Commissioner as the defendant in this
action.

# I.   BACKGROUND

## A. Procedural History

On June 8, 2016, Pacheco filed for Supplemental Security Income ("SSI"), and now alleges an amended disability onset date of June 14, 2012.  Administrative Record ("AR"), Dkt. No. 14, at 10, 30, 52; Pl. Mem. at 1.[2]  The Social Security Administration ("SSA") denied Pacheco's claim on August 24, 2016.  *Id.* at 71–81.  He subsequently requested a hearing before an Administrative Law Judge ("ALJ") on October 19, 2016.  *Id.* at 84–88.  On April 24, 2019, Pacheco, represented by counsel, appeared and testified before ALJ Mark Solomon in Manhattan.  *Id.* at 27–51.  Jack Greenberg, a Medical Expert, and Melissa Fass-Carlin, a Vocational Expert ("VE"), also appeared and testified.  *Id.* at 42–46, 47–50.  In a decision dated May 8, 2019, the ALJ found Pacheco not disabled, and denied his claims.  *Id.* at 7–18.  Pacheco sought review of the ALJ's decision by the Appeals Council on July 2, 2019.  *Id.* at 181–85.  The Appeals Council denied the request on June 5, 2020, which rendered the ALJ's decision final.  *Id.* at 1–4.

Pacheco timely commenced this action on July 31, 2020, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §405(g).  Complaint ("Compl."), Dkt. No. 1.  The Commissioner answered Pacheco's complaint by filing the administrative record on April 26, 2021.  Dkt. No. 14.  On August 24, 2021,

---

[2] The page numbers refer to the sequential numbering of the Administrative Record provided on the bottom right corner of the page, not the numbers produced by the Electronic Case Filing ("ECF") System.

Pacheco moved for judgment on the pleadings and submitted a memorandum of law in support of his motion.  Notice of Motion, Dkt. No. 20; Memorandum of Law in Support of the Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), Dkt. No. 21.  The Acting Commissioner cross-moved for judgment on the pleadings on November 1, 2021, and submitted a memorandum in support of her cross-motion. Notice of Cross-Motion, Dkt. No. 24; Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings ("Def. Mem."), Dkt. No. 25.  On November 22, 2021, Pacheco submitted reply papers.  Reply Brief ("Pl. Reply"), Dkt. No. 26.

### B. The Administrative Record

#### 1. Pacheco's Background

Pacheco was born on March 12, 1977.  AR at 33.  At the time of the hearing, he was 39 years old and lived by himself in the Bronx.  *Id.* at 30, 32, 34. Pacheco claims he is unable to work mainly due to major depressive disorder and post-traumatic stress disorder ("PTSD"), though he also suffers from ocular hypertension, degenerative disc disease, and glaucoma.  *Id.* at 30, 54, 830.[3]  Pacheco

---

[3] Major depressive disorder, also known as "depression," is a mood disorder that causes a persistent feeling of sadness and loss of interest.  It may affect how one feels, thinks, and behaves and can lead to a variety of emotional and physical problems as well as cause trouble doing normal day-to-day activities. *Depression (Major Depressive Disorder)*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/depression/symptoms-causes/syc-20356007 (last visited Mar. 7, 2022). Post-traumatic stress disorder "PTSD" is a mental health condition that is triggered by a terrifying event — either experiencing it or witnessing it. Symptoms may include flashbacks, nightmares, and severe anxiety, as well as uncontrollable

has a history of schizo-affective disorder and depression that he claims was

diagnosed in April 2003.  *Id.* at 392.  Pacheco reported to a therapist that he was

abused by his mother as a child, until the age of ten.  *Id.* at 1178.  He first began

seeing a psychiatrist at the age of seven after verbalizing suicidal ideas to his

mother.  *Id.* at 395.  Pacheco has also had several psychiatric hospitalizations.  He

was hospitalized at Mount Sinai Hospital for one month in July 2003 and one

month in March 2004.  *Id.* at 392.  He was also hospitalized at Metropolitan

Hospital in March 2003 for three weeks and at Harlem Hospital in January 2004

for four days.  *Id.* at 392.  In April 2003, he attempted suicide.  *Id.* at 392.

Pacheco was referred to the Arbor WeCare Wellness Program in 2007 for

dysthymic disorder, and later began receiving treatment at the Brooklyn Center for

Psychotherapy in August 2010.  *Id.* at 969, 1077.[4]  He began attending weekly

individual psychotherapy in September 2010 and receiving monthly medication

---

thoughts about the event.  *Post-Traumatic Stress Disorder (PTSD)*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/post-traumatic-stress-disorder/symptoms-causes/syc-20355967 (last visited Mar. 7, 2022).  Degenerative disc disease is when normal changes that take place in the disks of your spine cause pain.  *What is Degenerative Disk Disease?* WebMD, https://www.webmd.com/back-pain/degenerative-disk-disease-overview (last visited Mar. 7, 2022); Glaucoma is a group of eye conditions that damage the optic nerve, the health of which is vital for good vision.  This damage is often caused by an abnormally high pressure in your eye.  *Glaucoma*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/glaucoma/symptoms-causes/syc-20372839 (last visited Mar. 7, 2022).

[4] Dysthymia, also known as persistent depressive disorder, is a continuous long-term chronic form of depression.  *Persistent Depressive Disorder (Dysthymia)*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/symptoms-causes/syc-20350929 (last visited Mar. 7, 2022).

management in October 2010.  *Id.* at 969.  Pacheco also received physical therapy for degenerative disc pain in the past, but "stopped when he had Medicaid issues," and was not receiving any medical treatment as of 2015.  *Id.* at 475.

Pacheco was incarcerated from 2012 to 2014, and for five months in 2018.  *Id.* at 33, 1140.  He last worked as a process server until he was fired in December 2002, and has not worked since.  *Id.* at 392, 396, 413.

### 2.  Relevant Medical Evidence

#### a.  Treatment History

##### i.  Nickeema Lyte (Cox), LCSW – Treating Therapist

Nickeema Lyte (Cox), a licensed clinical social worker ("LCSW") at Community Counseling & Mediation ("CCM"), treated Pacheco for weekly individual psychotherapy.  AR at 973, 1159, 1246.[5]  In both a January 23, 2015 evaluation and a March 15, 2016 evaluation, Pacheco presented with "depression, hypervigilance, and sleep disturbance."  *Id.* at 1159, 1246.  He was diagnosed with major depression, PTSD, ocular hypertension, and received a Global Assessment of Functioning ("GAF") score of 70.  *Id.*  Pacheco reported that he had a history of suicidal thoughts, but that he hadn't "truly [made] an attempt" explaining that at 26 years old, he went to the roof and contemplated jumping off, but his mother

---

[5] The exact date of the initial assessment is unclear in the record; a letter from CCM dated December 9, 2015 notes that Pacheco attended an intake assessment on that date and would begin seeing Lyte, "his therapist," on December 23.  *Id* at 973. However, further notes from Lyte throughout the record reflect a treatment date as early as January 23, 2015.  *Id.* at 1246.

called the police, and he was hospitalized instead. *Id.* at 1150. However, he noted that he had not felt suicidal in about ten years. *Id.* at 1152. Pacheco reported having "strained relationships" at a later evaluation. *Id.* at 1149.

He continued treatment with Lyte through at least August 30, 2017. *Id.* at 1170–75. On that date, a CCM assessment listed Pacheco's provider as Lyte, and that he attended weekly therapy with him. *Id.* at 1170, 1174.[6] Pacheco presented with PTSD, depression, strained relationships, and a history of severe physical abuse in childhood. *Id.* Lyte reported that Pacheco's affect was "constricted" and his mood was "anxious," though his judgment was "fair" and he was "well oriented in all spheres." *Id.* at 1173. His preliminary diagnosis at that time was "major depressive disorder, recurrent, moderate" and PTSD. *Id.* at 1174.

### ii. Jing An – Treating Therapist

On November 13, 2018, Pacheco began seeing Jing An at CCM for weekly individual psychotherapy. *Id.* at 1177, 1282.[7] In her psychosocial assessment, she noted that due to Pacheco's depression, his sleep was disturbed, he had a poor appetite, and he isolated himself a lot. *Id.* at 1177. She observed that his affect was "appropriate," but his mood "depressed." *Id.* at 1179. She found no evident conceptual disorganization, an "open and cooperative attitude," the ability to

---

[6] This assessment was labeled as a Psychosocial Intake Assessment, and it is unclear why an intake assessment would be needed for an ongoing patient.

[7] The record does not reflect Jing An's title, but the psychosocial intake assessment conducted at CCM on November 13, 2018 notes that she is a "therapist." *Id.* at 1177. The ALJ refers to her as a "treating source" and the Commissioner notes that she is a "psychotherapist." *Id.* at 15; Def. Mem. at 11.

verbalize awareness of "problems, consequences, and causes," and good judgment.

*Id.* at 1179.  Pacheco reported having suicidal thoughts in the recent summer and

that he had "wanted to hang himself but didn't take action."  *Id.* at 1179, 1282,

1284.  She listed his diagnosis as "major depressive disorder, recurrent, severe with

psychotic symptoms, active," and "post-traumatic stress disorder, chronic, active."

*Id.* at 1180.

On November 16, 2018, An completed a medical source statement.  *Id.* at

1211–14.  She noted that she was treating Pacheco through weekly 45-minute

individual therapy sessions.  *Id*.  An reported that Pacheco suffered from:

> Poor memory, sleep disturbance, mood disturbance,
> anhedonia or pervasive loss of interests, paranoia or
> inappropriate suspiciousness, feelings of
> guilt/worthlessness, difficulty thinking or concentrating,
> suicidal ideation or attempts, catatonia or grossly
> disorganized behavior, social withdrawal or isolation, a
> 'blunt, flat, or inappropriate affect,' decreased energy,
> obsessions or compulsions, intrusive recollections of a
> traumatic experience, persistent irrational fears,
> generalized persistent anxiety, somatization unexplained
> by organic disturbance, hostility and irritability, and
> pathological dependence or passivity.

*Id*.  She also observed that Pacheco's sleep and appetite were disturbed by his major

depressive disorder, and that he was easily irritated.  *Id.* at 1212.  She found that

Pacheco had an "extreme loss" in his ability to perform the basic mental activities of

work on a "regular and continuing basis."  *Id.* at 1212.  Consequently, An

determined that Pacheco's ability to "understand, remember, and carry out

instructions," as well as "respond appropriately to supervision, co-workers, and

work pressure in a work-setting" were affected by his impairments.  *Id.* at 1212–13.

Lastly, An found that Pacheco was not able to manage benefits in his own best interest.  *Id.* at 1214.

In December 2018, An reported that Pacheco's depression had decreased, his sleep pattern and appetite improved, and he experienced "less PTSD symptoms." *Id.* at 1290.  He was "mentally and emotionally stable."  *Id.* at 1290-91.  An then reported in March 2019 a current diagnosis of chronic PTSD and again noted depression, "poor sleep pattern and appetite," and that Pacheco would continue weekly individual psychotherapy.  *Id.* at 1286–87.

### iii. Stacie Dee, PNP – Treating Nurse Practitioner

Stacie Dee, a psychiatric nurse practitioner ("PNP") at CCM, began treating Pacheco for medication management in January 2015.  *Id.* at 975.  Pacheco reported "hypervigilance, sleep disturbance, ruminating thoughts, anhedonia, sensitivity to noise, poor concentration and intermittent irritability."  *Id.* at 974.  After completing an evaluation, she determined Pacheco's diagnoses were major depressive disorder and "moderate PTSD."  *Id.* at 974–975. Dee determined that Pacheco was attending weekly psychotherapy and monthly medication management "consistently."  *Id.*  She found that he was "temporarily unemployable" but did not identify any specific limitations.  *Id.* at 975.  Dee reported that Pacheco's condition had not been "resolved or stabilized" and that it was the "current focus of treatment."  *Id.*

Dee later evaluated Pacheco on March 5, 2015.  AR at 971–72.  Pacheco reported a "depressed mood, anhedonia, sadness, hopelessness, fatigue, poor

8

concentration, sleep disturbance" and "nightmares, flashbacks, hypervigilance and avoidance of situations connected to past traumatic events." *Id.* at 971. Dee listed Pacheco's diagnoses as major depressive disorder and PTSD. *Id.* While Dee found that Pacheco's condition had been "resolved or stabilized," she also determined that Pacheco's symptoms "hinder[ed] daily functioning." *Id.* at 972. As a result, she reported that he was "unable to work for at least twelve months" but failed to indicate how she reached her conclusion. *Id.* Dee reported that Pacheco was still receiving weekly psychotherapy and monthly medication management. *Id.* at 971.

### iv. Tom Perron, NP – Treating Nurse Practitioner

Tom Perron, a nurse practitioner ("NP"), began treating Pacheco for medication management in August 2015 when he was in need of an evaluation for supportive housing. *Id.* at 1241. Pacheco reported symptoms of depression, including "periodic insomnia," poor concentration, and irritability. *Id.* Pacheco denied poor appetite, insomnia, or paranoia. *Id.* In another assessment on May 4, 2016, Pacheco reported that he had tried Prozac, "but it made him feel agitated and angry," and Lexapro worked much better. *Id.* at 1146. Pacheco further reported that he was put on Zyprexa but "didn't like it at all" and stopped taking it after being released from the hospital. *Id.*[8]

---

[8] Zyprexa, the brand name for an olanzapine injection, is used to treat schizophrenia, to treat episodes of agitation in people who have schizophrenia or people who have bipolar I disorder and are experiencing mania. *Olanzapine Injection*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a614016.html (last visited Mar. 7, 2022).

In his assessments, Perron noted constricted affect and anxious mood, but that neither Pacheco's remote nor recent memory were impaired.  *Id.* at 1147.  He remarked that with respect to insight, Pacheco was able to "verbalize awareness of problems and sees consequences."  *Id.*  Finally, he found that Pacheco had fair judgment, had the ability to attend and maintain focus, and was able to resist urges.  *Id.*

### b.  Opinion Evidence

#### i.  Aurelio Salon, M.D. – Consultative Physician

Dr. Aurelio Salon, an internal medicine specialist, evaluated Pacheco on July 7, 2016.  AR at 380–83.  Pacheco reported major depressive disorder, PTSD, degenerative disc disease, ocular hypertension, tuberculosis, and treated hypertension.  *Id.*  Pacheco reported that he had been depressed since 1998, and had "several hospitalizations," the last being in 2004.  *Id.*  He reported a history of attempting to jump from the roof of a building, and that he "had been followed up by psychiatrist monthly and by psychotherapist weekly since then," after a diagnosis of depression and PTSD.  *Id.*  Pacheco claimed he had ocular hypertension in both eyes since he was a teenager and was told when he was in prison that he could be predisposed to glaucoma.  *Id.*  He reported being on Remeron 20 mg, Xalatan drops, and over-the-counter Advil.  *Id.* at 380–81.[9]  He explained that cooking, cleaning,

---

[9] Remeron, the brand name of mirtazapine, is used to treat depression by increasing certain types of activity in the brain to maintain mental balance.  *Mirtazapine*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a697009.html (last visited Mar. 7, 2022).

and laundry were done by the shelter where he was living, but that he was able to shop, shower, and dress by himself. *Id.* at 381.

Dr. Salon indicated that Pacheco appeared to be in no acute distress, had a normal gait, could walk on heels and toes without difficulty, complete a full squat, had a normal stance and could rise from a chair without difficulty. *Id.* at 381. Dr. Salon also noted that Pacheco showed no evidence of impaired judgment, no evidence of significant memory impairment, had a normal affect, and that Pacheco denied suicidal ideation. *Id.* at 382. Dr. Salon found that based on his evaluation, there was no objective finding to support that Pacheco would be restricted in his ability to sit or stand, or in his capacity to climb, push, pull, or carry heavy objects. *Id.* at 383.

### ii. Haruyo Fujiwaki, Ph. D. – Consultative Psychologist

Dr. Haruyo Fujiwaki conducted an evaluation of Pacheco on July 21, 2016. AR at 1092. He reported that Pacheco had been living in a shelter since his release from prison in 2014, had a bachelor's degree in philosophy, and claimed he was unable to work due to major depressive disorder. *Id.* at 1093. Pacheco explained that he was last hospitalized in 2004 for suicidal ideation, because he "just did not want to live. He just wanted to die." *Id.* at 1093. Dr. Fujiwaki found no triggering stressors and noted that Pacheco was receiving psychiatric treatment. *Id.* at 1093. Pacheco reported he last felt suicidal "a few months ago, with no specific plan or intent." *Id.* at 1094. Further, Pacheco explained that certain things made him anxious, such as "dealing with people or certain situations." *Id.* Pacheco reported

11

that he was diagnosed with PTSD because of physical abuse by a family member as a child. *Id.*

Dr. Fujiwaki noted Pacheco's affect was "somewhat tense" and his mood "mild[ly] dysthymic." *Id.* at 1095. He found that Pacheco's attention, concentration, and both recent and remote memory skills, were intact. *Id.* at 1095. He found that Pacheco had average intellectual functioning, fair to poor insight, and fair judgment. *Id.* at 1095. He concluded that vocationally, Pacheco could "follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, and maintain a regular schedule." *Id.* at 1095–96. However, he remarked that Pacheco would need assistance to manage funds due to a history of substance abuse. *Id.* at 1096. After making a diagnosis of unspecified depressive disorder, unspecified anxiety disorder, cannabis use disorder in sustained remission, and history of major depressive disorder, Dr. Fujiwaki determined Pacheco's prognosis was "fair." *Id.*

### iii. Dr. O. Fassler, Ph.D. – State Agency Non-Examining Psychiatric Consultant

Dr. O. Fassler, Ph.D, submitted a Medical Determinable Impairments and Severity Form for Pacheco on August 24, 2016. AR at 58–64. Based on a review of the record, Dr. Fassler opined that Pacheco had mild difficulties in maintaining concentration, persistence, or pace, and moderate difficulties in maintaining social functioning. *Id.* at 58. He further opined that Pacheco was moderately limited in his abilities to: "get along with coworkers or peers without distracting them or exhibiting behavioral extremes," "respond appropriately to changes in the work

setting," and "interact appropriately with the general public."  *Id.* at 61.  Dr. Fassler found Pacheco to be independent in activities of daily living, although he previously noted he had "mild" restriction of activities of daily living.  *Id.* at 58, 62.  Finally, Dr. Fassler found Pacheco retained the ability to perform basic mental demands of unskilled work with limited interpersonal contact.  *Id.* at 62.

### 3.  ALJ Hearing

On April 24, 2019, Pacheco, represented by attorney Jacques Farhi, appeared before the ALJ in Manhattan.  AR at 29.  His attorney argued that Pacheco was unable to work because of "severe" psychiatric problems throughout his life and worsening visual problems.  *Id.* at 30.  His attorney stressed the significance of Pacheco's current therapist's opinion.  *Id.* at 30.

Pacheco testified that because of his depression he "just can't even function." *Id.* at 38.  Pacheco's depression began "sometim[e] in his teens" although he first saw a therapist when he was seven.  *Id.* at 30, 39.  He testified that he was hospitalized in 2004 and 2005 due to his psychiatric problems.  *Id.* at 39.  He indicated that he was fired from his last job because he would "come in late all the time," and he testified that his PTSD disrupts his ability to work for an eight-hour period.  *Id.* at 40–41.

He explained that his depression affects his memory, concentration and makes him irritable around others.  *Id.* at 41.  When asked for examples of problems with his memory, he responded: "I forgot the seat that you gave me to come here, I forgot my medication. Yes, I have memory problems."  *Id.* at 40.  When

asked about his ability to adjust to others in a work environment, Pacheco replied he did not know, because it "had been a while." *Id.* at 41. Pacheco said that his PTSD caused flashbacks, nightmares, and he perceives normal behavior from others as a threat. *Id.* at 40–41. Pacheco alleged his condition worsened during his incarceration, and that he took medication to help his sleep. *Id.* at 36, 41–42.[10]

At the time of the hearing, he had last felt suicidal two months earlier, in February 2019. *Id.* at 38. He testified that he had experienced suicidal ideation since the age of seven when he tried to jump off a roof. *Id.* at 39. He testified further that his suicidal ideation "comes and goes . . . maybe every other month and last[s] for a while . . . for a couple of weeks." *Id.* at 38. He explained that he was able to live alone, shop, manage his finances, take care of personal needs, and travel by himself on public transportation. *Id.* at 34–35, 37. However, he alleged that his condition was "not getting any better" and "doesn't ever go away." *Id.* at 39. Pacheco testified that he had weekly sessions with Jing An, his therapist, and that she knew his condition best. *Id.* at 38–39.

Pacheco also claimed that he is disabled due to visual problems and degenerative disc disease. *Id.* at 30–31, 35, 38, 54. He explained that ocular hypertension had caused blurry vision in his left eye "all [his] life." *Id.* at 37. Wearing glasses improved his vision. *Id.* at 37. He was able to read normal-size print but had to "put it close to [his] face" and could identify large objects in the

---

[10] The transcript of the hearing notes that Pacheco said he took "Limerol," but based on the record this may in fact have been "Remeron." *Id.* at 36.

street.  *Id.* at 38.  Pacheco explained that his degenerative disc disease created a

"nagging discomfort."  *Id.* at 35.  When asked whether he received treatment for his

back, he responded that he did not currently because he had lost his referral for

physical therapy.  *Id.* at 35.  Moreover, Pacheco explained that he could not "sit for

too long "because of the "feeling in [his] tail bone and lower back."  *Id.* at 36.  He

testified that the longest he could sit was "a couple hours."  *Id.* at 36.

Next, the ALJ questioned medical expert Jack Greenberg, who specializes in

ophthalmology.  *Id.* at 42.  When asked about Pacheco's indication of ocular

hypertension, Dr. Greenberg explained that it was "within the realm of being a

glaucoma suspect" but that there were no definitive diagnoses of glaucoma.  *Id.* at

43–44.  Dr. Greenberg found that Pacheco did not meet or equal the listing of

impairments because Pacheco is "near-sighted and needs glasses in order to see

well" whereas Listing 2.2 is based on the claimant's "best corrected vision."  *Id.* at

44.

The ALJ then questioned the VE.  *Id.* at 47.  The ALJ asked the VE whether

there were any unskilled jobs in the national economy that a hypothetical

individual with the same age, education, and work experience as Pacheco could

perform if subject to the following limitations and restrictions: 1) no exertional

limitations; 2) can perform the full range of simple, repetitive, unskilled work; 3)

ability to understand, remember, and carry out simple instructions; 4) ability to

make simple work-related decisions; and 5) ability to maintain attention and

concentration for rote work but would require a "low-stress" job, defined as one with

only occasionally close, personal, interpersonal contact with co-workers, supervisors, and the public. *Id.* at 47–48. The VE concluded that based on these conditions, the hypothetical individual could work as a hand packager, routing clerk, or document preparer. *Id.* at 48. The ALJ then asked the VE if there would be any jobs the same hypothetical individual could perform if "unable to tolerate normal stress in the workplace." *Id.* The VE replied no. *Id.* The VE also stated that there would be no jobs Pacheco could perform if the ALJ found him to have "no useful ability to work in coordination with or proximity to others without being unduly distracted." *Id.* She then noted that an individual could be off work five percent of the workday before he or she would be deemed unable to work. *Id.*

Next, Pacheco's attorney asked the VE about a hypothetical individual with "marked loss" in the ability to do the aforementioned activities, who could only sustain performance for one-third of the workday in: 1) remembering locations and work-life procedures; 2) counting out detailed instructions; 3) maintaining regular attendance and being punctual; 4) working in coordination with others; and 5) interacting the public and answering simple questions. *Id.* at 49. The VE responded that the hypothetical person could not do any of the jobs previously mentioned; that there is "no work" for him or her. *Id.*

## II.   DISCUSSION

### A.  Legal Standards

#### 1.  Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v.*

*Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).  On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g).  However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

## 2.  Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also Colgan v. Kijakazi*, 22 F.4th 353, 357 (2d Cir. 2022). Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id*. (citations omitted).

### a. Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4). First, the Commissioner must establish whether the claimant is

presently employed. 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed,

the Commissioner goes to the second step and determines whether the claimant has

a "severe" impairment restricting his ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).

If the claimant has such an impairment, the Commissioner moves to the third step

and considers whether the medical severity of the impairment "meets or equals" a

listing in Appendix One of Subpart P of the regulations. 20 C.F.R. §

404.1520(a)(4)(iii). If so, the claimant is considered disabled.  *Id.*; 20 C.F.R. §

404.1520(d).  If not, the Commissioner continues to the fourth step and determines

whether the claimant has the residual functional capacity ("RFC") to perform his

past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not

have the RFC to perform past relevant work, the Commissioner completes the fifth

step and ascertains whether the claimant possesses the ability to perform any other

work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537

F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the

Commissioner at the fifth and final step, where the Commissioner must establish

that the claimant has the ability to perform some work in the national economy.

*See, e.g., Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.  Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial."  *Sims*

*v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ,

unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop

the record in light of the essentially non-adversarial nature of a benefits

proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation

marks omitted).  As part of this duty, the ALJ must "investigate the facts and

develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at

111.  Specifically, under the applicable regulations, the ALJ is required to develop a

claimant's complete medical history.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§

404.1512(d)–(f)).  This responsibility "encompasses not only the duty to obtain a

claimant's medical records and reports but also the duty to question the claimant

adequately about any subjective complaints and the impact of the claimant's

impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-

11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold

question.  Before determining whether the Commissioner's final decision is

supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be

satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's

regulations' and also fully and completely developed the administrative record."

*Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y.

July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751,

755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL

22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully

develop the record is a bedrock principle of Social Security law." (citing *Brown v.

Apfel*, 174 F.3d 59 (2d Cir. 1999)))).  The ALJ must develop the record even where

the claimant has legal counsel.  *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir.

1996).  Remand is appropriate where this duty is not discharged.  *See, e.g., Moran*,

569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported

by substantial evidence but because the ALJ should have developed a more

comprehensive record before making his decision.").

### c. Treating Physician Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in

determining whether a claimant is disabled under the [Social Security] Act."  *Pena*

*ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y.

Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)) (internal quotation

marks omitted).[11]  A treating physician's opinion is given controlling weight,

provided the opinion as to the nature and severity of an impairment "is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and

is not inconsistent with the other substantial evidence in [the] case record."  20

C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).  The regulations define a treating physician

as the claimant's "own physician, psychologist, or other acceptable medical source

who provides [the claimant] . . . with medical treatment or evaluation and who has,

or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. §

---

[11] Revisions to the regulations in 2017 included modifying 20 C.F.R. § 404.1527 to
clarify and add definitions for how to evaluate opinion evidence for claims filed
before March 27, 2017, such as Pacheco's.  *See* REVISIONS TO RULES REGARDING THE
EVALUATION OF MEDICAL EVIDENCE, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017).
Accordingly, this opinion and order applies the regulations that were in effect in
June 2016 when Pacheco's claims were filed, with the added clarifications provided
in the 2017 revisions.

404.1502.  Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).

A treating physician's opinion is not always controlling.  For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner.  *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").  Additionally, where "the treating physician issued opinions that [are] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight."  *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative

23

record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420

(quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.

1998) (discussing ALJ's duty to seek additional information from treating physician

if clinical findings are inadequate).  As a result, "the 'treating physician rule' is

inextricably linked to a broader duty to develop the record.  Proper application of

the rule ensures that the claimant's record is comprehensive, including all relevant

treating physician diagnoses and opinions, and requires the ALJ to explain clearly

how these opinions relate to the final determination." *Lacava v. Astrue*, No. 11-CV-

7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this

Circuit, the [treating physician] rule is robust."), *adopted by* 2012 WL 6621722 (Dec.

19, 2012).

To determine how much weight a treating physician's opinion should carry,

the ALJ must consider the "*Burgess* factors" outlined by the Second Circuit: "(1) the

frequen[cy], length, nature, and extent of treatment; (2) the amount of medical

evidence supporting the opinion; (3) the consistency of the opinion with the

remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*,

925 F.3d at 95–96 (citation omitted); *see also Burgess*, 537 F.3d at 129; 20 C.F.R. §

404.1527(c)(2).  This determination is a two-step process.  "First, the ALJ must

decide whether the opinion is entitled to controlling weight." *Estrella*, 925 F.3d at

95. Second, if, based on these considerations, the ALJ declines to give controlling

weight to the treating physician's opinion, the ALJ must nonetheless

"comprehensively set forth reasons for the weight" ultimately assigned to the

treating source.  *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133

(responsibility of determining weight to be afforded does not "exempt administrative

decisionmakers from their obligation . . . to explain why a treating physician's

opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R.

§ 404.1527(d)(2)).  If the ALJ decides the opinion is not entitled to controlling

weight, "[a]n ALJ's failure to 'explicitly' apply these '*Burgess* factors' when

[ultimately] assigning weight at step two is a procedural error."  *Estrella*, 925 F.3d

at 96 (quoting Selian, 708 F.3d at 419–20).  The regulations require that the SSA

"always give good reasons in [its] notice of determination or decision for the weight"

given to the treating physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d

Cir. 1998) (alteration in original) (citations omitted). Indeed, "[c]ourts have not

hesitate[d] to remand [cases] when the Commissioner has not provided good

reasons."  *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d

at 33) (second and third alteration in original) (internal quotation marks omitted).

   Crucially, "an ALJ's failure to apply the correct legal standard constitutes

reversible error if that failure might have affected the disposition of the case."

*Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler v. Astrue*,

546 F.3d 260, 265 (2d Cir. 2008)).  However, the Court need not remand the case if

the ALJ only committed harmless error*, i.e.*, where the "application of the correct

legal principles to the record could lead only to the same conclusion." *Zabala v.

Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v.

Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### d. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at \*6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id*. (quoting *Aponte v. Sec'y of Health and Human Servs*., 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at \*10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id*. (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id*. First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id*. (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the

26

claimant's] symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence' of record." *Id*. (citing 20 C.F.R. §

404.1529(a)). Among the kinds of evidence that the ALJ must consider (in addition

to objective medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location,
> duration, frequency, and intensity of the individual's pain
> or other symptoms; 3. [f]actors that precipitate and
> aggravate the symptoms; 4. [t]he type, dosage,
> effectiveness, and side effects of any medication the
> individual takes or has taken to alleviate pain or other
> symptoms; 5. [t]reatment, other than medication, the
> individual receives or has received for relief of pain or
> other symptoms; 6. [a]ny measures other than treatment
> the individual uses or has used to relieve pain or other
> symptoms (e.g., lying flat on his back, standing for 15 to
> 20 minutes every hour, or sleeping on a board); and 7.
> [a]ny other factors concerning the individual's functional
> limitations and restrictions due to pain or other
> symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July

2, 1996)).

### B. The ALJ's Decision

On May 8, 2019, in a nine-page decision, the ALJ found that Pacheco was not

disabled from June 8, 2016 through the date of the decision. AR at 18. At step one

of the five-step inquiry, the ALJ found that Pacheco had not been engaged in

substantial gainful activity since his alleged disability onset date. *Id.* at 12. At step

two, the ALJ found that Pacheco had the following severe impairments: PTSD and

major depressive disorder. *Id.* In addition, the ALJ found that Pacheco had the

following nonsevere impairments: suspected glaucoma, lattice degeneration of the

retina bilaterally, dry eye, and nearsightedness which is corrected with glasses. *Id.* However, he found insufficient evidence existed to support a finding of physical limitations because of a lumbar degenerative condition or ulnar nerve injury. *Id.* at 12–13. In particular, the ALJ noted that the lumbar degenerative condition "ha[d] not manifested in clinical findings of any significance and the claimant has not had continuing care for the condition." *Id.* at 12. Similarly, there was no record of continuing care for the ulnar nerve injury after a handcuffing incident. *Id.*

At step three, the ALJ found that Pacheco did not have "an impairment or combination of impairments" that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). *Id.* at 13. In so deciding, the ALJ first determined that the "paragraph B" criteria were not satisfied because no cognitive limitations in the record caused at least two "marked" limitations or one "extreme" limitation. *Id.* The ALJ further considered whether "paragraph C" criteria were satisfied and found that the evidence failed to suggest that Pacheco's mental disorder was "serious and persistent." *Id.* at 13–14.

Prior to evaluating step four, at which he determined that Pacheco had no past relevant work, the ALJ determined Pacheco's RFC and found that Pacheco could perform a full range of work at all exertional levels but with the following nonexertional limitations:

> full range of simple, repetitive, unskilled rote work, can remember, understand, and carry out simple instructions, can make simple work-related decision, can maintain attention and concentration for rote work, and would

> require a low stress job which requires only occasional
> close interpersonal contact with supervisors and
> coworkers, and no close interpersonal contact with the
> general public.

*Id.* at 14. In making this finding, the ALJ considered "all symptoms and the extent

to which these symptoms can reasonably be accepted as consistent with the

objective medical evidence and other evidence." *Id.* After he found that an

underlying physical or mental impairment could reasonably be expected to produce

the claimant's pain or other symptoms shown, the ALJ then evaluated the

"intensity, persistence, and limiting effects" of Pacheco's symptoms, to determine

the extent to which they limited his functional limitations. *Id.* The ALJ noted that

where statements about the "intensity, persistence, or functionally limiting effects

of pain or other symptoms" are not substantiated by objective medical evidence, he

must consider other available evidence in the record. *Id.*

The ALJ then weighed the medical evidence. *Id.* at 14–16. He gave "partial

weight" to Dr. Fujiwaki's examination, which found that Pacheco's "memory and

concentration were intact," that he was "independent in activities of daily living,"

and that he could "travel by himself and sometimes visited friends." *Id.* at 14.

However, the ALJ determined that Dr. Fujiwaki's findings that Pacheco had

moderate limitations relating to others and for dealing with stress, were "vague and

[did] not state how it would affect the claimant's ability to work." *Id.* The ALJ

determined that Dr. Fujiwaki's findings demonstrated that Pacheco could perform

simple work in a low contact job; however, he accorded partial weight because they

were based on a one-time examination. *Id.* at 14–15.

The ALJ next considered Jing An's medical source statement.  *Id.* at 15. While he noted that as a therapist she was not an "acceptable medical source," nonetheless he "considered the opinion as that of a treating source."  *Id.*  He accorded "little weight" to Jing An's findings that Pacheco had multiple symptoms including "sleep and appetite disturbance," was "easily irritated," took Remeron "with no side effects," and that he had "multiple marked and extreme limitations in functioning."  *Id.*  The ALJ opined that these findings "grossly overstated" Pacheco's symptoms and limitations based on the treatment notes in the record.  *Id.*  The ALJ highlighted, in particular, various inconsistencies with the limitations indicated on the form, and the rest of the record.  *Id.*  He found that though An noted that Pacheco had marked limitations "maintaining social functioning," Pacheco had reported that he "[has] friends, [has] friends help him with household chores, and he can travel by himself."  *Id.*  Moreover, the ALJ noted that though An indicated Pacheco is unable to manage benefits, he handled his own money.  *Id.*  Further, though An reported Pacheco had frequent deficiencies in concentration and memory, there were no documented limitations in concentration and memory in his mental status examination record and treatment record.  *Id.*  Lastly, the ALJ found that although An determined that Pacheco had moderate limitations in activities of daily living, she did so "without stating what these limitations [we]re."  *Id.*

The ALJ next evaluated and accorded "partial weight" to the findings of the State Agency physician, Dr. Fassler, because he was a non-examining and non-treating source.  *Id.*  He noted that Dr. Fassler's opinion supported a finding that

Pacheco had severe mental impairments and should be limited to "low contact work with others" based on Pacheco's anxiety around others. *Id.*

Looking to other evidence in the record, the ALJ noted that records from CCM in May 2016 described symptoms of depression. *Id.* However, the ALJ remarked that at that time, a month prior to the filing date, Pacheco "denied feelings of worthlessness, poor appetite, insomnia, hallucinations, or manic symptoms." *Id.* The ALJ found that in December 2016, Pacheco was "mildly depressed" and was attending therapy consistently, but had not had medication management since July 2016, and was not taking medication. *Id.* Follow-ups in March and August of 2017 further demonstrated Pacheco's non-compliance with medication. *Id.* Following his incarceration, Pacheco had court mandated therapy in November 2018. *Id.* His assessment at CCM resulted in examination notes indicating that although Pacheco had complaints for "poor sleep and appetite" due to depression, his mental status examination was "fully normal, except for depressed mood." *Id.* Moreover, the November 2018 examination reported "no deficits in concentration, memory, psychomotor activity, thought content, or judgment." *Id.* at 16. Prior to this, Pacheco's last examination had been in August 2017. The most recent records from CCM were from March 2019 and determined that Pacheco had a GAF score of 65 with a diagnosis of PTSD. *Id.* The ALJ gave "some weight" to the GAF scores, which he found showed "a very mild level of depression," but he highlighted that they reflect a "snapshot of what the claimant's level of functioning is at that particular time and is not an indication of overall

31

functioning." *Id.* The ALJ also noted that although Pacheco reported limited impulse control and easily getting angered when provoked, he could calm himself down. *Id.*

The ALJ observed that Fedcap records from September 2018, following Pacheco's release from incarceration, found no "special travel needs or limitations." *Id.* at 16. The ALJ noted that in a September 2018 evaluation, Pacheco reported not being able to work due to "back pain and psychiatric issues." *Id.* However, Pacheco reported no psychiatric treatment from August 2017 through April 2018, right before his incarceration, and reported back pain of "2/10." *Id.* The Fedcap examination indicated "full range of motion in the back, pain on forward flexion of straight leg raise, and normal examination of the thighs." *Id.* Further, according to the report, Pacheco could "lift and carry 10 pounds, could walk 40 minutes continuously, could stand 40 minutes continuously, and had no limitations sitting." *Id.*

The ALJ accorded "little weight" to the Fedcap finding that Pacheco "could not rejoin the workforce within 12 months due to psychiatric issues." *Id.* at 16. He noted first that these findings were "not from a treating source, not from a specialist, and were based on a superficial examination without detail and little basis for concluding the claimant's conditions would last 12 months." *Id.* Additionally, the ALJ found the Fedcap statement to be "conclusory," citing that even if a doctor had stated these limitations, "they would not be disabling under the regulations of the Social Security Administration." *Id.* In addition, the ALJ noted

that Pacheco "had no treatment at all for his back" and pointed to a lack of evidence in the treatment records to suggest physical limitations "at all" other than "some pain on forward flexion." *Id.* Though records from March 2016 reflected a history of lumbar degenerative disc disease, Pacheco reported walking daily, and his physical examination "including back and extremities" were "fully normal." *Id.* Finally, the ALJ found various notes from the report about Pacheco's stress making symptoms worse, and anxiety around crowds, to be "vague," though he limited Pacheco to low contact work in the RFC. *Id.* Lastly, the ALJ noted that in the month before filing for SSI, Pacheco filed a housing application in which he denied sleep and appetite disturbance; however, the examination found "no impairment of memory, intact, concentration, and normal psychomotor activity." *Id.*

Accordingly, the ALJ found that his determination of Pacheco's RFC was supported both by objective medical evidence, as well as the opinions of treating and non-treating sources, to the extent to which he found such opinions credible or entitled to weight. *Id.* at 16.

At step five, the ALJ concluded that there were jobs that exist in significant numbers in the national economy that Pacheco could perform, such as hand packager, routing clerk, and document preparer. *Id.* at 17. The ALJ considered that Pacheco had "no past relevant work," and thus no transferable skills, "limited education," and was "able to communicate in English." *Id.* at 17. He found that Pacheco's ability to "perform work at all exertional levels [had] been compromised by nonexertional limitations," based on the VE's testimony. *Id.* at 17. The ALJ

found that the VE's testimony was consistent with information contained in the

Dictionary of Occupational Titles.  *Id.* at 17.

### C. Analysis

Pacheco argues that this case should be remanded for three reasons: 1) the

VE's testimony did not constitute substantial evidence (Pl. Mem. at 11–12); 2) the

ALJ failed to accord proper weight to the assessment of his therapist (Pl. Mem. at

12–17); and 3) the ALJ erred while determining the RFC by failing to consider the

amount of monthly absences he would have as a result of his mental limitations (Pl.

Mem. at 17–18).  The Commissioner counters that the ALJ's decision should be

affirmed because: 1) the ALJ's decision applied the correct legal standards and was

supported by substantial evidence (Def. Mem at 15–16); 2) the ALJ properly

weighed the medical opinions (Def. Mem. at 17–20); and 3) substantial evidence

supports the ALJ's RFC and credibility findings (Def. Mem. at 20–25).  For the

reasons which follow, the Court remands Pacheco's case based on the ALJ's failure

to fully develop the record and provide adequate reasoning for the weight assigned

to the opinion of Pacheco's therapist.[12]

### 1.  The ALJ Failed to Fully Develop the Record

Pacheco argues that the ALJ's disability determination relied on assessments

conducted in 2016, and since the ALJ hearing did not take place until 2019, the ALJ

---

[12] Because the Court remands on other grounds, it will not address Pacheco's
argument that the ALJ failed to properly consider the VE's testimony.  Additionally,
Pacheco only raises arguments with respect to his psychiatric impairments.
Therefore, the Court will not consider his degenerative disc disease, ocular
hypertension, or other physical impairments in rendering its decision.

should have further developed the record.  Pl. Mem at 17.  More specifically, Pacheco contends that the ALJ should have either requested an updated psychiatric consultative examination or had a psychiatric medical expert testify at the 2019 hearing in order to determine whether Pacheco's condition had changed since 2016. Pl. Mem. at 17.  In reviewing the evidentiary materials before the ALJ, the Court concludes that the ALJ did not properly fulfill his duty to develop the record.

To satisfy the duty to develop the record, "an ALJ should have medical evidence from a medical source with a sufficiently persuasive opinion noting the existence and severity of a disability." *Brooks v. Kijakazi*, No. 20-CV-7750 (GBD) (JLC), 2022 WL 213994, at *17 (S.D.N.Y. Jan. 25, 2022) (report and recommendation) (citing *Marinez v. Comm'r of Soc. Sec*, 269 F. Supp. 3d 207, 216 (S.D.N.Y. 2017)).  The ALJ's duty is "enhanced when the disability in question is a psychiatric impairment," as is the case here.  *Marinez*, 269 F. Supp. 3d at 215 (quoting *Lacava*, 2012 WL 6621731, at *11).

An ALJ is under no obligation to continue seeking additional information "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history.'"  *Rosa v. Callahan,* 168 F.3d 72, 79, n.5 (2d Cir. 1999) (citing *Perez v. Chater,* 77 F.3d 41, 48 (2d Cir. 1996)).  However, if there is a gap in the record, the ALJ cannot use "the absence of evidence to draw an adverse inference."  *Ligon v. Astrue*, No. 11-CV-0162 (JG), 2012 WL 6005771, at *20 (E.D.N.Y. Dec. 3, 2012)).

Here, there are notable gaps in the record with respect to evidence from a medical source with a "sufficiently persuasive opinion." *See Brooks,* 2022 WL 213994, at *17. First, the ALJ "failed to obtain or attempt to obtain the records" of other providers who treated Pacheco. *Rosa*, 168 F.3d at 80. Pacheco had been treated at CCM on a regular basis since December 2014. AR at 1177. Specifically, Lyte treated him regularly at least between 2015 and 2017, yet no medical source opinion from Lyte exists in the record, and it is not clear on the record before the Court whether the ALJ sought one as he is required to do. *Id.* at 1159, 1170. *See, e.g., Starr v. Comm'r of Soc. Sec.*, No. 20-CV-4484 (GWG), 2022 WL 220408, at *5 (S.D.N.Y. Jan. 26, 2022) (ALJ must make "every reasonable effort" to obtain from an individual's treating health care provider all medical evidence necessary to properly make disability determination). Because the regulations define this requirement as "at least the 12 months preceding the month in which a claim is filed," the ALJ should also have, at a minimum, reached out to Tom Perron for a medical source statement. *Id.* (cleaned up). Perron treated Pacheco within the 12 months preceding June 2016 when his claim was filed (including in August 2015 and May 2016). AR at 1241, 1146.

Second, the ALJ did not seek an updated medical source statement from An after determining the one she provided to be of little weight, despite the fact that she was the only treating source to provide a medical source opinion and that she continued to treat Pacheco for more than four months between her statement and the hearing before the ALJ. *See Mondschein v. Saul,* No. 3:19-CV-1019 (RAR), 2020

36

WL 4364058, at *4–6 (D. Conn. Jul 30, 2020) (requiring ALJ to obtain additional evidence either through opinion from new source or "updated opinion" from source who provided one just two months after beginning to treat plaintiff); *Thomas M.N. v. Comm'r of Soc. Sec.*, No. 5:19-CV-360 (GTS), 2020 WL 3286525, at *5 (N.D.N.Y. Jun. 18, 2020) (directing ALJ to further develop record with updated opinion evidence to clarify functional limitations).  Because the ALJ's duty to develop the record can be extended to "the time that elapses between the claimant's application and the claimant's hearing date," additional information from An, a weekly treating source, through to the time of the hearing was warranted.  *Corporan v. Comm'r of Soc. Sec.*, No. 12-CV-6704 (JPO), 2015 WL 321832, at *27 (S.D.N.Y. Jan. 23, 2015) ("The ALJ here had a duty to develop [the claimant's] record up to the hearing, which includes attempting to obtain evidence [the ALJ] learned about during the hearing.") (quoting *Scott*, 2010 WL 2736879, at *14, n.60).

These two gaps mean that the only functional assessments in Pacheco's medical record to which the ALJ gave more than "little weight" were completed by a consultative examiner and a non-examining opinion source, despite medical records provided by treating providers.  The Second Circuit has "frequently cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," a direction that is "even more pronounced in the context of mental illness where . . . a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health."  *Ferraro v. Saul*, 806 F. App'x 13, 16 (2d Cir. 2020) (quoting *Estrella*, 925 F.3d at 98).

As in *Ferraro*, the ALJ here improperly gave the most weight to the opinion of a consultative examiner, who met with Pacheco once, and corroborated the opinion with a state agency medical examiner who only "reviewed" Pacheco's medical records. *Id.* at 15; AR at 14–16.  Specifically, the ALJ accorded "partial weight" to Dr. Fujiwaki's and Dr. Fassler's opinions, noting that they were based on a one-time examination and from a non-examining source, respectively.  AR at 14–15.  The bulk of the medical review then consisted of the ALJ reviewing other objective medical evidence himself, which is legal error.  AR at 15–16.  *See Donofrio v. Saul*, No. 18-CV-9968 (ER), 2020 WL 1487302, at *8 (S.D.N.Y. Mar. 27, 2020) ("an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error") (quoting *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010)).

When an ALJ is required to determine an RFC, his failure to request a functional assessment when no such assessment exists in the record or when any such assessments are insufficient constitutes a failure of his duty to develop the record.  *See Romero v. Comm'r of Soc. Sec.*, No. 18-CV-10248 (KHP), 2020 WL 3412936, at *13 (S.D.N.Y. June 22, 2020) (collecting cases).  Here, there is no evidence that the ALJ made any reasonable efforts to obtain further statements from CCM.  Moreover, when an ALJ's RFC determination is questioned by a claimant, a reviewing court's "decision not to remand assumes that there are no obvious gaps in the record precluding the ALJ from properly assessing the

38

claimant's residual functional capacity." *Newton v. Berryhill*, No. 18-CV-1244 (MPS), 2019 WL 4686594, at *2 (D. Conn. Sept. 26, 2019) (quoting *Downes v. Colvin*, No. 14-CV-7147 (JLC), 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015)); *see also Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) (ALJ required to seek out additional evidence when there are "obvious gaps" in administrative record). Because there are such "obvious gaps" here, the Court must remand.[13]

### 2. The ALJ Failed to Properly Apply the Treating Physician Rule to Pacheco's Treating Therapist

#### a. The ALJ Erred by Not Explicitly Considering the *Burgess* Factors

Next, Pacheco argues that the ALJ erred by failing to properly weigh the opinion of his treating therapist, Jing An, which should have been given "significant weight." Pl. Mem. at 12–17. The Commissioner responds that the ALJ

---

[13] Pacheco argues that the ALJ "should have developed the record" by seeking an updated consultative psychological examination to determine whether Pacheco's condition had changed since his consultative examination in 2016, three years prior to the administrative hearing. Pl. Mem. at 17. An ALJ's failure to obtain a consultative examination, "if such an evaluation is necessary for the ALJ to make an informed decision," is reversible error. *Calvin E. v. Saul*, No. 5:18-CV-060 (CFH), 2019 WL 2869681, at *7 (N.D.N.Y. July 3, 2019) (citing *Falcon v. Apfel*, 88 F. Supp. 2d 87, 90–91 (W.D.N.Y. 2000)). However, an ALJ has discretion to determine whether a consultative examination is needed, "and is only required to order such an examination where . . . it is necessary to resolve a conflict or ambiguity in the record." *Phelps v. Colvin*, 20 F. Supp. 3d 392, 401–02 (W.D.N.Y. 2014). *See Rosa*, 168 F.3d at 79 n.5 (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)). "The mere passage of time does not necessarily render an opinion outdated or stale." *Marozzi v. Berryhill*, No. 6:17-CV-06864-MAT, 2019 WL 497629, at *7 (W.D.N.Y. Feb. 8, 2019) (cleaned up). Thus, while the Court remands on other grounds, the ALJ's decision not to seek an updated consultative examination alone does not constitute a failure to develop the record.

appropriately weighed the medical records "based on their supportability and their consistency with the record as a whole." Def. Mem. at 17. After reviewing the record, the Court concludes that the reasons the ALJ provided for assigning "little weight" to An's opinion were insufficient.

As an initial matter, an ALJ must first determine whether the treating source's opinion is entitled to controlling weight. *See Estrella*, 925 F.3d at 96 (quoting *Burgess*, 537 F.3d at 128 ("[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record'")). As a therapist, An's opinions are not entitled to controlling weight. *See McQuillan v. Saul,* No. 3:19-CV-00191 (SRU), 2020 WL 1545778, at *11 (D. Conn. April 1, 2020) (licensed clinical social workers and therapists are considered "other sources" and need not be assigned controlling weight)*; see also Grega v. Saul*, 816 F. App'x 580, 583 (2d Cir. 2020) (licensed clinical social worker not acceptable medical source); *see also Rodriguez v. Comm'r of Soc. Sec.*, No. 20-CV-9040 (KHP), 2021 WL 5154112 at *4 (S.D.N.Y. Nov. 5, 2021) (licensed clinical social worker not viewed as *medical* source).

However, the ALJ explicitly considered An's opinion "as that of a treating source," AR at 15, to which the Commissioner did not seem to object. Def. Mem. at 17. Moreover, social workers and therapists are "other sources" whose opinions can be considered to evaluate "the severity of [an] impairment[ ] and how it affects [a

claimant's] ability to work." 20 C.F.R. § 404.1513(d). SSR 06–03p, which was in

effect at the time of the ALJ's decision, directs ALJs to "use the same factors for the

evaluation of the opinions of acceptable medical sources to evaluate the opinions of

medical sources who are not acceptable medical sources, such as licensed social

workers." SSR 06–03p; *Romero v. Saul*, No. 18-CV-10460 (NSR) (JCM), 2020 WL

2951068, at *16 (S.D.N.Y. Feb. 3, 2020), *adopted by* 2020 WL 1189301 (Mar. 11,

2020); *Franklin v. Colvin*, No. 16-CV-06478 (ALC), 2018 WL 1449524, at *7

(S.D.N.Y. Mar. 23, 2018) ("Opinions from other sources should be evaluated based

on the same factors for the evaluation of the opinions of acceptable medical

sources") (cleaned up). Further, the opinions of nonmedical sources are "critically

important" to determining the nature and degree of a claimant's impairment in

circumstances where they are the only treating source, as is the case here.

*Cavanaugh v. Astrue*, No. 1:08-CV-0637 (LEK) (VEB), 2009 WL 4264370, at *7

(N.D.N.Y. Nov. 20, 2009) (quoting *Bergman v. Sullivan,* No. 88–CV–513, 1989 WL

280264, *3 (W.D.N.Y. Aug. 7, 1989)).

　　　If the ALJ determines the treating source's opinion is not entitled to

controlling weight, he must then "explicitly consider" the *Burgess* factors outlined

by the Second Circuit to establish how much weight, if any, to assign it. *Estrella*,

925 F.3d at 95–96 (cleaned up). Specifically, an ALJ is required to consider: "(1) the

frequen[cy], length, nature, and extent of treatment; (2) the amount of medical

evidence supporting the opinion; (3) the consistency of the opinion with the

remaining medical evidence; and (4) whether the physician is a specialist." *Id.*

Here, the ALJ failed to "comprehensively set forth reasons for the weight" accorded to An's opinion.  *Halloran*, 362 F.3d at 33.  First, at the step of assigning appropriate weight, the ALJ correctly determined that An was not entitled to controlling weight because her opinion was not that of an acceptable medical source. AR at 17.  However, the ALJ failed to consider that a nonmedical treating source can be given controlling weight, if it does not contradict the evidence in the record. *See, e.g.*, *Baldwin v. Astrue*, No. 07-CV-6958 (RJH) (MHD), 2009 WL 4931363, at *22–23 (S.D.N.Y Dec. 21, 2009).

Because the ALJ gave An's opinion less than controlling weight, he should have "explicitly considered" the *Burgess* factors in determining how much weight to accord her opinions.  *Estrella*, 925 F.3d at 95–96 (cleaned up).  Here, however, the ALJ considered only the third *Burgess* factor: the consistency of the opinion with the remaining medical evidence.  He determined that An's findings "grossly overstated" Pacheco's impairments based on the evidence in the record.  *Id.* at 15.  To reach that conclusion, the ALJ highlighted discrepancies between Pacheco's testimony at the administrative hearing and his treatment records.  *Id.* at 15.  He noted, in particular, that Pacheco had friends, was able to travel alone, was able to manage benefits, and that there were no issues with his concentration and memory.  *Id.* at 15.[14]  Consequently, the ALJ accorded only "little weight" to Jing An's findings that

---

[14] The ALJ remarked on the discrepancy between how the "form indicates that the claimant has marked limitations maintaining social functioning, even though the claimant has reported having friends, having friends help him with household chores, and he can travel by himself." AR at 16.  However, upon review of the record, Pacheco has not reported "having friends," but rather indicated that one

Pacheco had, among other things, "marked and extreme limitations in functioning." *Id.*

With respect to the remaining *Burgess* factors, first, the ALJ failed to consider the frequency and length of treatment by An.  *See, e.g.*, *Ramos v. Comm'r of Soc. Sec.*, No. 13-CV-3421 (KBF), 2015 WL 7288658, at *7 (S.D.N.Y. Nov. 16, 2015) (remanding in part because ALJ did not consider length of treating physician's relationship).  The ALJ's failure to do so constitutes error.  *See, e.g., Price v. Comm'r of Soc. Sec.*, No. 19-CV-8499 (JPO), 2021 WL 1222139, at *4 (S.D.N.Y. Mar. 31, 2021) (ALJ erred in failing to explicitly consider length and nature of doctor-patient relationship when discounting attending psychiatrist's opinions).  In the case of psychiatric impairments, the length and frequency of mental health treatment is "especially relevant in evaluating a claimant's psychiatric impairments."  *Gorman v. Colvin*, No. 13-CV-3227 (JG), 2014 WL 537568, at *6 (E.D.N.Y. Feb. 10, 2014); *see also Rodriguez v. Astrue*, No. 07-CV-534 (WHP) (MHD), 2009 WL 637154, at *26 (S.D.N.Y. Mar. 9, 2009) ("The mandate of the treating-physician rule to give greater weight to the opinions of doctors who have a relationship with a plaintiff is particularly important in the mental-health context.").  The regulations recognize that mental disabilities may be difficult to

---

friend comes to his house to do household chores for him."  *Id.* at 34–35.  Having one friend who comes to help with household chores "has little relevance" to Pacheco's ability to maintain social functioning in a workplace setting.  *Ferraro*, 806 F. App'x at 16 (despite ALJ and Commissioner's contention, plaintiff's ability to care for his father at home had "little relevance to his ability to function in a work setting where he would need to interact appropriately with co-workers and take instructions from authority figures").

detect during any given evaluation.  *See Santiago v. Barnhart*, 441 F. Supp. 2d 620, 629 (S.D.N.Y. 2006).  Further, the "longitudinal picture" of medical impairments "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. §§ 404.1527(a).  Notably, the ALJ recognized this elsewhere in his decision, when he accorded only "partial weight" to the consultative psychologist's findings, noting that "they were based on a one-time examination."  AR at 14–15.

Here, An only began treating Pacheco on November 13, 2018, just a few days before submitting her opinion on November 16, 2018.  *Id.* at 1177.  However, she noted that he was an old patient at CCM, where An was his provider, and that he first started his counseling there in December 2014.  *Id.*  Further, she noted that she would be treating Pacheco "every Tuesday" for ongoing psychotherapy.  *Id.*  The ALJ did not address the frequency or length of treatment with An at all – he did not assert, for example, that this lack of longevity in a treating relationship was a factor in his decision to assign little weight to her opinion.  Likewise, despite the known frequency with which Pacheco saw An in the months prior to the hearing, the ALJ did not seek an updated opinion form from her, despite considering her opinion to be that of a "treating source" and the record containing no other treating source opinion.  *Id.* at 15; *see supra* Section C(1).

Second, the ALJ erred by not explicitly acknowledging An's professional specialization as a therapist.  *Id.* at 15.  Failure to explicitly weigh a treating

physician's specialty when affording less than controlling weight is also an error that warrants remand. *See, e.g., Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 266–67 (S.D.N.Y. 2016); *Denver v. Berryhill*, No. 19-CV-1312 (AJN) (KHP), 2020 WL 2832752, at *2 (S.D.N.Y. June 1, 2020) (ALJ must give "express consideration" to specialization in order to justify overriding treating physician's opinion). While therapists are not "acceptable medical sources," they are "other sources" whose opinions can be considered to evaluate the "the severity of [an] impairment[ ] and how it affects [a claimant's] ability to work." *Maldonado v. Berryhill*, No. 16-CV-165 (JLC), 2017 WL 946329, at *24 (S.D.N.Y. Mar. 10, 2017) (citing 20 C.F.R. § 404.1513(a), (d)); *see also Katz v. Comm'r of Soc. Sec.*, No. 19-CV-2762 (PKC), 2020 WL 5820146, at *5, n.11 (E.D.N.Y. Sept. 30, 2020) (ALJ can solicit information from "treating therapist" as well as treating physician where medical evidence is contradictory or insufficient). Accordingly, the ALJ also erred by affording An's opinions limited weight without considering her specialization.

Lastly, the ALJ failed to adequately explain his determination that An's findings were inconsistent with the record as a whole. AR at 15. Courts in this District have found that "an ALJ's failure to consider the consistency of the physicians' opinions with each other . . . constitutes legal error." *Williams v. Saul*, No. 19-CV-10443 (AT) (JLC), 2020 WL 6385821, at *13 (S.D.N.Y. Oct. 30, 2020), *adopted sub nom. by Williams v. Comm'r of Soc. Sec.*, 2020 WL 7337864 (Dec. 14, 2020); *see, e.g., Denver*, 2020 WL 2832752, at *2 (failure to "give any weight to the fact that [certain physicians'] opinions are consistent with other medical evidence in

45

the record because *they are consistent with one another*" constitutes legal error)
(emphasis in original).  Although an ALJ must consider evidence that contradicts
the opinion of a treating physician, he must also account for evidence supporting
that opinion.  *Craig*, 218 F. Supp. 3d at 266.

The ALJ reached numerous conclusions about the consistency of An's
opinions and the rest of the record, which he failed to explain.  AR at 17.  The ALJ
found that An's determination that Pacheco was unable to manage benefits, was
contradicted by Pacheco's testimony that he "currently manages his own money."
*Id.* at 15.  However, the report of Dr. Fujiwaki, the consultative psychologist who
conducted an assessment in 2016, found that Pacheco would need assistance in
managing his own funds due to a history of substance abuse.  *Id.* at 1096.  In
addition, an evaluative assessment conducted by Stacie Dee, in March 2015,
similarly found that Pacheco's symptoms "hinder daily functioning" and that he was
unable to work for at least 12 months.  *Id.* at 972.  In a later follow up, she noted
that Pacheco was temporarily unemployable.  *Id.* at 975.  A work ability assessment
by Dr. Sundaraya Chandrasekaran at Narco Freedom in June 2015, and a Fedcap
evaluation by Dr. Ralph Heiss in September 2018, reached the same conclusion as
to the effects of Pacheco's mental impairments on his ability to work.  *Id.* at 515–17,
1123–40.

An ALJ may not "pick and choose evidence which favors a finding that a
claimant is not disabled."  *Kuchenmeister v. Berryhill*, No. 16-CV-7975 (HBP), 2018
WL 526547, at *21 (S.D.N.Y. Jan. 19, 2018) (cleaned up) (collecting cases).  The ALJ

was required to at least resolve any discrepancies between the rest of the record and

Jing An's opinion. *See Schisler v. Bowen*, 851 F.2d 43, 47 (2d Cir. 1988). Therefore,

the ALJ did not properly explain his assignment of weight to An's opinion within

the requirements of the treating physician rule.

### b. The ALJ's Errors Were Not Harmless

Finally, the ALJ's failure to properly apply the treating physician rule was

not harmless. The proper application of the rule is potentially dispositive in

determining whether Pacheco is disabled within the meaning of the Act. *See, e.g.,*

*Roman v. Saul,* No. 19-CV-3688 (JLC), 2020 WL 4917619, at *20 (S.D.N.Y. Aug. 21,

2020) (ALJ's analysis not harmless error because had ALJ credited treating

physician's opinion, it may have resulted in conclusion that claimant could not

work).

An indicated that Pacheco showed "marked or extreme" limitations

interacting appropriately with the public, getting along with co-workers or peers

without distracting them, and maintaining socially appropriate behavior. AR at

1211–14. An also opined that Pacheco would need to miss three days of work per

month for medical appointments. *Id.* at 1071. These opinions are particularly

significant in light of the VE's testimony that a hypothetical person who could not

interact with supervisors and would have to miss more than one day of work per

month would not be able to perform any jobs in the national economy. *Id.* at 49.

Accordingly, the ALJ's improper application of the treating physician rule was not

harmless. *See Pines v. Comm'r of Soc. Sec.*, No. 13-CV-6850 (AJN) (FM), 2015 WL

872105, at *10 (S.D.N.Y. Mar. 2, 2015) (internal quotation marks and citation omitted) (ALJ's analysis of treating physician's opinion was not harmless error because VE "essentially testified that if these opinions were adopted, [the claimant] would be unable to work"), *adopted by* 2015 WL 1381524 (Mar. 25, 2015).

### III.    CONCLUSION

For the foregoing reasons, Pacheco's motion for judgment on the pleadings is granted, the Commissioner's cross-motion is denied, and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g).

**SO ORDERED.**

Dated: March 9, 2022
        New York, New York

_____
JAMES L. COTT
United States Magistrate Judge